**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STANCY NESBY,                                   No. C 05-3555   JL

        Plaintiff,

        v.                              **PARTIAL SUMMARY JUDGMENT**
                                                **(granting Docket # 54)**

THE CITY OF OAKLAND, ET AL.,

        Defendants.
_____/

## Introduction

This Court has jurisdiction over this case pursuant to 42 U.S.C. section 1983. All parties consented to the jurisdiction of this Court as provided by 28 U.S.C. section 636(c) and Civil Local Rule 73. Defendants moved for partial summary judgment. Both parties moved to exclude certain evidence. The Court heard oral argument. Jivaka Candappa appeared for Plaintiff Stancy Nesby. Pelayo A. Llamas, Jr., Deputy City Attorney, appeared for Defendants.

The Court considered the pleadings and arguments of counsel and hereby grants partial summary judgment for Defendants, as to Nesby's claims under the Fourth and Fourteenth Amendments and 42 U.S.C. §1983, including a *Monell* claim for excessive force against the City of Oakland. Defendant Anderson had probable cause to make a traffic stop because the license plate tabs on Nesby's car were the wrong color, not the current color. It was reasonable for Anderson to verify the validity of the temporary

United States District Court

For the Northern District of California

1  registration, once he observed it. When Nesby informed him of a felony no-bail warrant in

2  her name, he had a duty to investigate further. However, he had no duty to confirm her

3  identity in the field and taking her into custody was reasonable given that she fit the

4  parameters of the warrant as to her unique name, her sex, race and birth date. Therefore

5  the stop and detention were reasonable under the Fourth Amendment and Defendant

6  Anderson is entitled to qualified immunity. Nesby cannot maintain any claim under the

7  Fourteenth Amendment because her claim rests on the same foundation as her claim

8  under the Fourth Amendment.

9        Nesby also fails to show any basis for a claim under 42 U.S.C. §1983, since she fails

10  to show racial animus. Nesby cannot maintain a *Monell* claim against the City in the

11  absence of an underlying Constitutional violation. Nesby shows no policy regarding arrests

12  and detentions which was violated and presents no evidence whatever of Defendant

13  Anderson's training, or that it was deficient, which also eliminates any liability under *Monell*

14  for the city. Defendants do not seek summary judgment on Nesby's claim of excessive

15  force by Anderson, only her claim for excessive force against the City under *Monell*.

16        Defendants ask the Court to exclude the evidence contained in the declarations of

17  John "Toby" Saucer, who was in the car with Nesby at the time of her arrest and offers the

18  main corroboration for her allegations. The Court at this time need not rule on Defendants'

19  motion, because Saucer's evidence is relevant for the most part to Nesby's claim of

20  excessive force against Anderson, which is not before the Court at this time. The Court

21  may exclude this evidence at trial and hereby re-opens discovery for the limited purpose of

22  allowing Defendants to take Saucer's deposition.

23        Nesby asks the Court to exclude evidence from several declarations in support of

24  Defendants' motion on grounds of hearsay and vagueness. The Court finds that the terms

25  to which Nesby objects, for example "verification" as applied to the warrant, can be

26  construed using their dictionary definitions and that the declarants testified according to

27  personal knowledge of procedures and that their declarations are therefore not hearsay.

28  The documents to which Nesby objects are the warrants central to this case and the minute

**United States District Court**
For the Northern District of California

1    orders of court proceedings and Nesby cannot credibly claim surprise that Defendants

2    would rely on them.

3                            **Background**

4        This Court has jurisdiction pursuant to 42 U.S.C. section 1983. All parties consented

5    to trial before this Court as provided by 28 U.S.C. section 636(c) and Civil Local Rule 73.

6    Defendants move for summary judgment on a number of Nesby's claims pursuant to Rule

7    56, Federal Rules of Civil Procedure.

8        The parties were unable to arrive at a Joint Statement of Undisputed Facts. Nesby

9    and Defendants each submitted a Separate Statement of Undisputed Material Facts.

10   Defendants also submitted a Request for Judicial Notice and an Index of Evidence offered

11   in support of their motion for summary judgment. Both parties offered objections to each

12   other's evidence, which the Court considered in arriving at its decision.

13       At the parties' request, the Court continued the settlement conference, and dates for

14   pretrial conference and trial. A settlement conference was conducted by Magistrate Judge

15   Chen on March 6, 2007. The case did not settle at that time. Pretrial Conference is May 30

16   and jury trial is June 18.

17                       **Defendants' Motion**

18       Stancy Nesby, an African American female, alleges constitutional claims under 42

19   U.S.C. Section 1983 for violations of her Fourth and Fourteenth Amendment rights under

20   the U.S. Constitution against the City of Oakland and Officer Anderson (the action was

21   dismissed as to Officers Williams and Wayne.) (Complaint at 4:12)

22       Defendants move for summary judgment on the following grounds:

23    1. As to Nesby's claims against Officer Anderson:

24           a) His conduct in effecting the traffic stop and detention was based on

25             probable cause and the subsequent arrest made pursuant to a facially valid

26             no-bail warrant was lawful.

27

28

**United States District Court**
For the Northern District of California

b) Nesby's Fourteenth Amendment due process claims are not actionable since, under the allegations of the complaint, they arise only under the Fourth Amendment.

c) There is insufficient evidence of any violations of Nesby's right to equal protection.

d) As to all of Nesby's claims, Officer Anderson is entitled to qualified immunity.

2. As to Nesby's claims against the City of Oakland:

a) Nesby cannot maintain a *Monell* claim against the city because there is no underlying constitutional violation.

b) Even if a constitutional violation occurred, there is insufficient evidence that Nesby suffered any such violation as a result of an official policy of the City of Oakland.

**Factual Background**

This is Nesby's version of the facts, with notation of Defendants' disputes as to her stated facts.

**The Traffic Stop**

In the afternoon of September 4, 2003, Plaintiff Stancy Nesby was stopped by Officer James Anderson of the Oakland Police Department at 2100 Telegraph Avenue near the intersection of 21st Street in Oakland.  (Nesby Decl. ¶ 2 and Ex. 3, Consolidated Arrest Report; Saucer Decl. ¶ 8.)  At the time of the traffic stop, Nesby was driving a 2002 Silver Dodge Intrepid, license number 4WMV283 and VIN Number 2B3HD46R32H264673, that she had purchased from Magnussen's Fremont Ford ("Magnussen's") approximately twenty (20) days prior on August 13, 2003.  (Nesby Decl. ¶ 2.)  Ms. Nesby was on her way to San Francisco with John "Toby" Saucer when she was stopped by Officer Anderson.  (Nesby Depo, at 65:17-22, 67:12-16, 71:22-25, 72:1-21, Saucer Decl. ¶¶ 3-4.)

Ms. Nesby stopped at a bank in Oakland on Broadway near 22nd Street.  (Saucer Decl. ¶ 5, Nesby Depo, at 67:17-21, 93:10-18.)  She used the outside ATM machine to

1   withdraw cash.  (Nesby Depo, at 95:1-15.)  After leaving the bank, Ms. Nesby drove up

2   Broadway, took a right on 20th Street and another right on Telegraph Avenue.  (Saucer

3   Decl. ¶ 6, Nesby Depo, at 95: 23-25, 96:1-4, 97: 1-4.)  Ms. Nesby had traveled about half a

4   block down Telegraph Avenue when Officer Anderson, who was traveling in the opposite

5   direction heading towards downtown Oakland, passed Ms. Nesby's vehicle.  (Saucer Decl.

6   ¶ 6.)  The officer made a u-turn, got behind Ms. Nesby's vehicle and turned on his

7   overhead lights.  (Saucer Decl. ¶ 7, Nesby Depo, at 97:9-25.)

8          According to the CD recording of the relevant police radio transmission, Officer

9   Anderson informed Dispatch that he was enforcing a vehicle stop and that his location was

10  20th and Telegraph.  (Washburn Decl. ¶¶ 17-18.)  Officer Anderson did not request cover.

11  (*Id.*)  Sixteen seconds later, Officer Anderson advised Dispatch of a failure to yield and

12  gave his location as Giant Burger at 22nd and Telegraph.  (*Id.* at ¶¶ 19, 23.)

13         Approximately ten minutes before advising Dispatch of the vehicle stop, Officer

14  Anderson ran a CLETS query on Ms. Nesby's vehicle license plates.  (Washburn Decl. ¶¶

15  28-29, Ex. 3.)  The CLETS inquiry did not show any wants on the vehicle including expired

16  registration.  (*Id.*)

17         The outcome of the CLETS query is in dispute. Defendants contend that "the

18  computer indicated that the plates were indeed expired," and that Anderson then activated

19  his lights and siren. (Anderson depo at 11:1-3).

20         Officer Anderson queried CLETS about the plates a second time, a few minutes

21  after the vehicle stop at Giant Burger.  (*Id.* at ¶ 29.)  Plaintiff states that the CLETS queries

22  did not show that the registration on Ms. Nesby's vehicle had expired.  (*Id.*) Again,

23  Defendants' version of the facts is that the CLETS query showed the plates on Nesby's

24  vehicle had expired.

25         Ms. Nesby pulled into the parking lot of ¼ Pound Giant Burger ("Giant Burger"), a

26  fast food establishment located at the intersection of Telegraph Avenue and 21st Street.

27  (Nesby Depo, at 98: 13-23, Saucer Decl. ¶¶ 8-9, Washburn Decl. ¶ 20.)  The distance from

28  Telegraph Avenue at 20th Street and the Giant Burger is no more than a block and a half

United States District Court

For the Northern District of California

1   and less than one minute of driving time.  (Saucer Decl. ¶ 8.)  It took Ms. Nesby about two

2   minutes to travel from the bank on Broadway to the Giant Burger parking lot.  (*Id.*)

3       Officer Anderson parked his vehicle about six feet behind Ms. Nesby's vehicle.

4   (Saucer Decl. ¶ 9.)  He walked up to her, greeted her and asked for her license and

5   registration.  (Saucer Decl. ¶ 10, Nesby Depo, at 99:14-17, 105:3-4.)  Ms. Nesby gave

6   Officer Anderson her license, advised him of the no-bail warrant which bore her name and

7   further informed him that she had just been released from jail.  (Nesby Depo, at 99:23-25,

8   100:1-2, 105:7-10, Nesby Decl. ¶ 4.)

9       Mr. Saucer asked Officer Anderson why he stopped Ms. Nesby.  (Saucer Decl. ¶ 10,

10  Nesby Depo, at 100:5-7.)  Anderson claimed that the registration on Ms. Nesby's vehicle

11  had expired.  (Saucer Decl. ¶ 10.)  Ms. Nesby and Mr. Saucer pointed to the temporary

12  registration permit that was fixed on the front right windshield of Ms. Nesby's vehicle.

13  (Nesby Depo, at 100: 8-9, 105:20-23, Saucer Decl. ¶¶ 10-12.)  Officer Anderson said that

14  he did not "acknowledge" that document.  (Saucer Decl. ¶ 12.)

15      When Ms. Nesby stopped her vehicle in the Giant Burger parking lot, she reached

16  into her purse and retrieved a copy of the "Alameda County Sheriff's Department Prisoner

17  Property Receipt," which was given to her when she was released from Santa Rita Jail on

18  September 4, 2003.  (Saucer Decl. ¶ 13, Nesby Decl. ¶ 4 and Ex. 2, Nesby Depo, at

19  106:21-25, 107:1-2, 62:1-4, 63:13-22.)  The receipt documented Ms. Nesby's incarceration

20  at Santa Rita Jail on September 3, 2003.  (Nesby Decl. ¶ 4, Nesby Depo, at 61: 11-13.)

21      Ms. Nesby handed Officer Anderson the Prisoner Property Receipt document when

22  he walked up to her vehicle.  (Nesby Depo, at 61: 14-17, 65:3-7, Saucer Decl. ¶ 14.)

23      Defendants do not include in their statement of facts either that Nesby and Saucer

24  pointed to the temporary registration or that Nesby produced the property receipt from her

25  purse. Defendants say instead that Nesby told Anderson that she had in the trunk of her

26  car the property receipt from Santa Rita Jail, showing that she had just been released from

27  there and that Anderson allowed her to look for it, but she couldn't find it. (Anderson Depo

28

1    at 34:21-22, 36:6-9, 15-21).

2        Ms. Nesby told the officer that there was a warrant for a person who had used her

3    name and that she was not the person wanted in connection with the warrant.  (Nesby

4    Decl. ¶ 4, Saucer Decl. ¶ 15.)  She said that an unknown woman had stolen her identity

5    and that she was released from Santa Rita jail on September 4 after the authorities had

6    confirmed that the warrant in question was not for her.  (Saucer Decl. ¶ 15, Nesby Depo, at

7    65:12-16, 65:23-25, 66:1-4, 105:11-16, 107:15-25, 108:1-7.)  She explained to the officer

8    that she would not have been released from jail on September 4, the day of the traffic stop,

9    if she were the person wanted in connection with the no-bail warrant.  (Nesby Depo, at

10   100:18-23.)

**The Arrest**

12       The officer told Ms. Nesby to step out of the vehicle and without waiting for her to

13   exit the vehicle, tried to pull her out.  (Saucer Decl. ¶ 16, Nesby Depo, at 101:2-4, 113:25,

14   114:1-24.)  Ms. Nesby emerged from the vehicle.  (Saucer Decl. ¶ 16, Nesby Depo, at 101:

15   5, 114:24-25.) The officer turned her around so that her back was to him.  (Saucer Decl.

16   ¶17.)  Ms. Nesby continued to tell the officer that the warrant was not for her and that she

17   was innocent.  (*Id.*)  He ignored her.  (*Id.*)  Several police vehicles arrived on the scene.

18   (Saucer Decl. ¶ 18, Washburn Decl. ¶¶ 23-24.)  Officer Anderson requested a wagon 24

19   seconds after advising Dispatch of the vehicle stop.  (Washburn Decl. ¶¶ 21-22.)

20       Officer Anderson arrested Ms. Nesby on the basis of information in an electronic

21   warrant that was generated pursuant to a bench warrant issued for an individual named

22   "Stancy Nesby," residing at 142 Harbor Drive.  (Nesby Decl, Ex. 3, Miller Decl. ¶ 30 and Ex.

23   7, Washburn Decl. ¶ 41.)  The electronic warrant abstract states that the individual wanted

24   on the warrant was a black female with a date of birth of May 12, 1976.  (Miller Decl. at ¶

25   31, Washburn Decl. ¶ 41.)  The warrant abstract does not state any other distinguishing

26   characteristics or information pertaining to the wanted person such as height, weight or eye

27   color.  (Miller Decl. at ¶ 32, Washburn Decl. ¶ 42.)

28

1   Oakland Police Department officers have access to the Automated Warrant System

2   ("AWS"), CLETS, NCIC and DMV databases from the mobile computer terminals in their

3   patrol vehicles.  (Bolton Depo, at 92:3-11, Ex. E.)  Officers can conduct DMV, criminal

4   history, probation or parole checks to ascertain the identity of a detainee.  (Bolton Depo, at

5   100:6-25, 101:1-5.)  NCIC checks would also return particular descriptive information such

6   as height and weight of the subject queried.  (Bolton Depo, at 94:21-25, 95:1-10.)  Officer

7   Anderson and the Oakland dispatchers did not make any inquiries to ascertain the

8   particular characteristics of the subject wanted in connection with the warrant before

9   arresting Ms. Nesby.  (Miller Decl. ¶¶ 33-39, Washburn Decl. ¶¶ 43-49.)

10                       **Alleged Excessive Force During the Arrest**

11   Nesby alleges numerous facts in support of a claim of excessive force against

12   Defendant Anderson. Defendants do not seek summary judgment on this claim, except as

13   applied to the City under *Monell v Dept. Of Social Services of City of New York*, 436 U.S.

14   658 (1978).

15   When Ms. Nesby got out of her vehicle, two Caucasian male officers rushed towards

16   her and assisted Officer Anderson with Ms. Nesby's arrest.  (Saucer Decl. ¶ 19.)  The

17   officers grabbed Ms. Nesby by her blouse, took her around to the passenger side of her

18   car, pushed her against the vehicle and bent her over the hood.  (Nesby Depo, at 101:5-8,

19   121:11-18, 126:3-12, Saucer Decl. ¶ 20-21.)  Ms. Nesby's blouse was raised above her

20   chest, her skirt was lifted above her waist, her underwear and breasts and buttocks were

21   exposed.  (Nesby Depo, at 101: 9-15, 103:12-25, Saucer Decl. ¶ 21.)  The officers kept Ms.

22   Nesby bent over her vehicle while they handcuffed her.  (Saucer Decl. ¶ 22.)  The officers

23   ran their hands over Ms. Nesby's body in what appeared to be a full body search and one

24   officer squeezed the cheek of her buttocks.  (*Id.*)

25   Ms. Nesby was handcuffed after her hands were pulled up behind the back of her

26   head.  (Nesby Depo, at 118:7-22, 119: 16-25, 120:1-7.)  Her arms were raised so high

27   behind her back that it seemed unnatural.  (Saucer Decl. ¶ 21.)  Ms. Nesby was in

28   excruciating pain because her arms would not extend that far behind her back.  (Nesby

Depo, at 118:15-25, 119:1-7, 120: 13-15, 121: 1-10.)  The handcuffs were very tight and Ms. Nesby told Officer Anderson that they were hurting her really badly.  (Nesby Depo, at 134:8-25.)  He did not adjust the handcuffs.  (Nesby Depo, at 136:5-9.)

The officers tore Ms. Nesby's blouse.  (Nesby Depo, at 122:8-11.)  They continued to apply pressure on Ms. Nesby for a few more minutes after the handcuffs were applied.  (*Id.* at 122:19-24, 124:23-25, 125:1-10.)  Ms. Nesby was in pain and "everything was showing."  (*Id.* at 122:25, 123:1-2, Saucer Decl. ¶ 24.)  She was crying.  (*Id.* at 115:1-4.)  She did not physically resist or struggle with the officers.  (*Id.* at 118:13, Saucer Decl. ¶ 23.)  She did not yell at the officer.  (Nesby Depo, at 115: 5-9.)  Ms. Nesby kept telling Officer Anderson that she was the victim.  (Nesby Depo, at 117: 20-24, Saucer Decl. ¶ 24.)

Mr. Saucer told the officers that Ms. Nesby's skirt was raised, that they were exposing her.  (Nesby Depo, at 128: 10-15, Saucer Decl. ¶ 26.)  The officers told him to stay in the car.  (Saucer Decl. ¶ 25, Nesby Depo, at 115: 17-18, 125:15-21.)  Mr. Saucer pulled Ms. Nesby's skirt down.  (Saucer Decl. ¶ 27, Nesby Depo, at 115:19-22, 125:22-23, 128:1-8, 129:1-25, 130:1-10.)  The officers then handcuffed Mr. Saucer.  (Saucer Decl. ¶ 28, Nesby Depo, at 115:22-24, 125:23-25.)  After Mr. Saucer pulled down Ms. Nesby's skirt, she was taken to the paddy wagon.  (Nesby Depo, at 128:23-25, 133:11-13, 133:22-25, 134:1-3, Saucer Decl. ¶¶ 30-31.)

Mr. Saucer witnessed a Caucasian male officer open the trunk of Ms. Nesby's vehicle and search inside.  (Saucer Decl. ¶ 29.)  The officer who conducted the search of the trunk locked Ms. Nesby's vehicle, threw her car keys in the trunk and shut it. (*Id.* at ¶ 32.)  That same officer thereafter released Mr. Saucer.  (*Id.* at ¶ 33.)

Officer Anderson promised Ms. Nesby that he would ensure that Ms. Nesby's prints were compared against the subject's prints on file with issuing agency, San Francisco (Nesby Depo, at 108:19-22, 139:19-22.)  But Anderson did not follow through on his promise.  (Nesby Depo, at 139:22-24, 108:24-25, 109, 110:1-4.)  After Ms. Nesby was transported to the Oakland City Jail, Officer Anderson did not know what happened to her. (Candappa Decl. ¶ 8, Ex. 5-Synopsis of Anderson IA interview.)

**United States District Court**
For the Northern District of California

1

**Detention at Oakland City Jail**

2   Ms. Nesby was locked in a cell at the Oakland Police Department jail. (Oakland City

3   Jail) (Nesby Depo, at 140:11 20.)  "Many hours later," after a shift change, she spoke with

4   another jailer who followed up on her request to verify whether she was wanted in

5   connection with the San Francisco warrant.  (Nesby Depo, at 140:21-25, 141:1-12.)  A few

6   hours later, she was released.  (Nesby Depo, at 141:13-17.)

7   At 10:10 p.m., the order to release Ms. Nesby was signed by the jail supervisor,

8   Anthony Wynne, a civilian employee.  (Davis Depo, at 36:5-25, 37:1:16, 52:14-17,

9   Washburn Decl. ¶¶ 37-38.)  The order to release Ms. Nesby states that the warrant did not

10  belong to Ms. Nesby and that someone else was using her name.  (Davis Depo, at 36:17-

11  24, Washburn Decl ¶ 37, Ex. 7.)  Wynne, however, did not have a recollection of the

12  incident when he was interviewed by Internal Affairs.  (Candappa Decl ¶ 10, Ex. 7.)

13  A prisoner must be released no sooner than four hours after the order to release is

14  received.  (Davis Depo, at 51:25, 52:1-17.)  An order to release that is approved takes the

15  utmost priority.  (Davis Depo, at 56:19-25, 57:1-5.)  The Oakland City Jail Certificate Card,

16  "402 Form" indicates that Ms. Nesby was released at 11:18 p.m.  (Davis Depo, at 52:18-25,

17  53:1-12.)  However, the 402 Form does not always accurately document a prisoner's

18  release time.  (Davis Depo, at 52:18-25, 53, 54:1-7.)  According to the jail activity record,

19  Ms. Nesby called her mother from jail on September 5, 2003, at12:40 a.m.  (Nesby Decl. ¶

20  6, Ex. 4.)  Ms. Nesby signed a property release.  (Nesby Depo, at 183:15-25, 185:1-18,

21  Nesby Decl, Ex. 3.)  The release was dated September 5, 2003.  (Nesby Decl. ¶ 5 Ex. 3.)

22  Ms. Nesby was eventually released on September 5, 2003, at approximately 1:00 a.m.

23  (Nesby Depo, at 144:8-11.)

24  Ms. Nesby suffered bodily injuries consequent to her arrest.  (Saucer Decl. ¶¶ 38-39,

25  Nesby Depo, at 144:16-22.)  Both her wrists were swollen, one more than the other.

26  (Nesby Depo, at 155:1-2.)  Both wrists were discolored, one wrist was purple, the other red.

27  (Nesby Depo, at 155:3-7.)  The pain remained even after the bruising dissipated.  (Nesby

28  Depo, at 155:15-20.) The pain lasted about two weeks.  (Nesby Depo, at 155:21-23.)  One

wrist was more painful than the other.  (Nesby Depo, at 155:25, 156:1-16.)  The

1   excruciating pain lasted for about a week and half and Ms. Nesby experienced mild pain for

2   a while thereafter.  (Nesby Depo, at 156:2-9.)  Ms. Nesby was traumatized by the entire

3   experience.  (Nesby Depo, at 157, 158, 159:1-13.)

4

5   **The Oakland Police Department Does Not Have a Policy Articulating the Particularity of Description Requirement on a Warrant.**

6   The published policy of the Oakland Police Department states that whenever there is

7   a question about the identity of a person arrested in connection with a warrant, the

8   transporting officer must refer the warrant to the patrol division supervisor for a final

9   decision as to whether or not it should be served.  (Bolton Depo, at 78:14-25, 79:1-9.)

10  However, the Oakland Police Department does not have a policy as to what constitutes an

11  adequate or sufficiently particular description on a warrant.  (Bolton Depo, at 67:22-25.)

12  The Oakland Police Department does not have a policy that would provide guidance and

13  direction to officers in circumstances where the description on a warrant is deemed

14  inadequate.  (Bolton Depo, at 67:21.)  And the Oakland Police Department does not have a

15  custom or practice of checking FBI databases in circumstances when the identity of a

16  subject detained in connection with an electronic warrant is in issue.  (Bolton Depo, at

17  103:6-21.)

18  Officers have subjective discretion to determine the sufficiency of the particular

19  description requirement in a warrant.  (Bolton Depo, at 68:1-3.)  According to the published

20  policy, if there is a doubt that the detainee is the person described in the warrant, the

21  benefit of the doubt shall be given to the detainee.  (Bolton Depo, at 69:9-23, Bolton Depo,

22  Ex. B.)  Officers are required to perform a reasonable investigation.  (Bolton Depo, at

23  69:24-25, 70:1-3.)

24  Oakland Police Department's General Order E-6 does not provide any guidance as

25  to what would constitute an adequate description under California Penal Code section

26  850(b), which sets forth the information that must be included in a serviceable warrant.

27  (Bolton Depo, at 74:7-23, Bolton Depo, Ex. B.)  There has been no attempt to articulate a

28  coherent application of the description requirement in a warrant.  (Bolton Depo, at 74:24-

25, 75:1-3, Bolton Depo, Ex. B.)  There are no department guidelines articulating what

United States District Court
For the Northern District of California

1  officers should do to ascertain the identity of a person wanted in connection with an

2  electronic warrant.  (Bolton Depo, at 81:3-25, 86-89, 90:1-18.)

3      **Oakland Police Department Officers Do Not Receive Adequate Training
       About The Particularity of Description Requirement on a Warrant.**

4

5      Oakland Police Department officers and trainee officers do not receive training about

6  the Automated Warrant System.  (Figueroa Depo, at 43:19-25, 44:1-7.)  The Oakland

   Police Department does not provide training to its officers on reading and understanding

7  the NCIC system.  (Figueroa Depo, at 45:19-23.)  There are no training bulletins on the

8  automated warrant system.  (Figueroa Depo, at 44:8-11.)  There are no training bulletins on

9  the NCIC system. (Figueroa Depo, at 45:19-23.)

10

11     The training manual on Laws of Arrest, which is used by instructors at the Police

12 Academy, devotes about three pages to warrants.  (*Id.*, Ex. A)  The section on warrants

13 references California Penal Code sections 815, 817, 840 and 849.  (Figueroa depo, at 43,

14 Ex. A.)  Section 850(b) is not mentioned.  (*Id.*)  Students at the Police Academy do not

15 receive any training about the particular description requirement of a warrant.  (Figueroa

16 Depo, at 41.)

17     **The Oakland Police Department Had A Custom or Practice Of Inaction
       And Indifference In Complying With The Mandatory Policy That A
       Subject Must Not Be Detained For More Than Four Hours Pending
18     Confirmation Of A Warrant.**

19     Oakland Police Department Prisoner Release Procedures mandates the release,

20 within four hours, of a prisoner being held on a warrant when the arresting agency does not

21 confirm the warrant.  (Davis Depo, at 23:6-25, 24:1-13, 23-25, 25:1-3, 30:6-8, Ex. A.)  In

22 practice, the Oakland Police Department does not comply with the mandatory policy that a

23 subject must not be detained for more than four hours pending confirmation of a warrant.

24 (Davis Depo, at 28:1-25, 29:1-10.)  Jail staff did not receive any training regarding the

25 policy mandating detention for no more than four hours for unconfirmed warrants.  (Davis

26 Depo, at 34:3-7.)

27

28     Jail staff have access to NCIC and FBI databases to confirm a warrant, but it is

   usually done at the County level.  (Davis Depo, at 38:1-9, 41:17-25, .42:1-13.)  The inmate

United States District Court

For the Northern District of California

1   would therefore sit in jail until the County responded.  (Davis Depo, at 42:14-16.)  FBI

2   databases can be checked assuming the individual queried has an FBI record.  (Davis

3   Depo, at 38:19-21.)  A subject's FBI number could be run to extract information from FBI

4   databases.  And a subject's FBI number could be obtained from the NCIC database.

5   (Davis Depo, at 38:1-9.)

6        As a supervisor and the person most knowledgeable about confirmation of warrants

7   in the Oakland City Jail, Sergeant Davis claimed to be ignorant of the Oakland Police

8   Department Prisoner Release Procedures mandating the release of a prisoner within four

9   hours when the arresting agency does not confirm the warrant for the prisoner in question.

10  (Davis Depo, at 30:6-8.)  The policy is clear, however, that a detainee must be released

11  within four hours if the warrant is not confirmed.  (Davis Depo, at 29:4-7.)

## Analysis

13       Summary judgment is appropriate when it is demonstrated that there exists no

14  genuine issue as to any material fact, and that the moving party is entitled to judgment as a

15  matter of law. Fed.R.Civ.P. 56 (c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

16       Under summary judgment practice, the moving party always bears the initial

17  responsibility of informing the district court of the basis of its motion, and identifying those

18  portions of "the pleadings, depositions, answers to interrogatories, and admissions on file

19  together with the affidavits, if any," which it believes demonstrate the absence of a genuine

20  issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the

21  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

22  judgment motion may properly be made in reliance solely on the 'pleadings, depositions,

23  answers to interrogatories, and admissions on file.' " *Id.* at 324, 106 S.Ct. 2548. Indeed,

24  summary judgment should be entered against a party who fails to make a showing

25  sufficient to establish the existence of an element essential to that party's case, and on

26  which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548. In such a

27  circumstance, summary judgment should be granted, "so long as whatever is before the

1   district court demonstrates that the standard for entry of summary judgment, as set forth in

2   Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548.

3       If the moving party meets its initial responsibility, the burden then shifts to the

4   opposing party to establish that a genuine issue as to any material fact actually does exist.

5   *Matsushita Elec. Indus. Co., Ltd.  v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *First*

6   *Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968).

7       In attempting to establish the existence of this factual dispute, the opposing party

8   may not rely upon the denials of its pleadings, but is required to tender evidence of specific

9   facts in the form of affidavits, or admissible discovery material, in support of its contention

10  that the dispute exists. Fed.R.Civ.P. 56(e). The opposing party must demonstrate that the

11  fact in contention is material, that is, a fact that might affect the outcome of the suit under

12  the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the

13  dispute is genuine, that is, the evidence is such that a reasonable jury could return a verdict

14  for the nonmoving party, *Id.* at 251-52.

15      In the endeavor to establish the existence of a factual dispute, the opposing party

16  need not establish a material issue of fact conclusively in its favor. It is sufficient that "the

17  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

18  versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 289, 88 S.Ct. 1575. Thus, the

19  "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order

20  to see whether there is a genuine need for trial.' " *Matsushita*, 475 U.S. at 587, 106 S.Ct.

21  1348 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

22      In resolving the summary judgment motion, the Court examines the pleadings,

23  depositions, answers to interrogatories, and admissions on file, together with the affidavits,

24  if any. Rule 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305-06 (9th Cir.1982). The

25  evidence of the opposing party is to be believed, and all reasonable inferences that may be

26  drawn from the facts placed before a court must be drawn in favor of the opposing party.

27  *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Nevertheless, inferences are not drawn out of

28  the air, and it is the opposing party's obligation to produce a factual predicate from which

United States District Court

For the Northern District of California

1  the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244-45

2  (E.D.Cal.1985), aff'd, 810 F.2d 898 (9th Cir.1987).

3      Finally, to demonstrate a genuine issue, the opposing party "must do more than

4  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the

5  record taken as a whole could not lead a rational trier of fact to find for the nonmoving

6  party, there is no 'genuine issue for trial.' " *Matsushita*, 475 U.S. at 586-87, 106 S.Ct. at

7  1356.

8  ### Summary Judgment Should Be Granted

9  ### Nesby Fails to Show Material Facts in Dispute Regarding *Monell* Claim Against

10 ### City Under 42 U.S.C. Section 1983 for 4th Amendment Violation or Excessive Force.

11     Defendants' motion for summary judgment should be granted because Nesby's

12 opposition to the motion presents no evidence establishing a material issue of fact for trial

13 relative to her §1983 claims. While Defendants' motion does not seek summary judgment

14 on Nesby's excessive force claim against Officer Anderson, the motion does seek summary

15 judgment on the excessive force *Monell* claim against the City of Oakland. (See

16 Defendants' Memorandum of Points and Authorities in Support of MSJ at 13:5-6; 14:3-7.) It

17 should be noted that Nesby has dismissed her equal protection and substantive due

18 process claims. (Oppn. at 1 fn.1.)

19     The undisputed facts show, as a matter of law, that Nesby's traffic stop for expired

20 registration tabs and subsequent arrest pursuant to a facially valid no-bail felony warrant

21 were both lawful. Nesby's evidence is insufficient to establish a *Monell* claim against the

22 city as to any of her constitutional claims. Nesby has offered no evidence that Officer

23 Anderson's training was insufficient or that it fell below generally accepted training

24 standards in the law enforcement field. Neither of Nesby's experts criticized the Oakland

25 Police Department's training or procedures.

26     The belated declaration of Toby Saucer submitted by Nesby, that contradicts and

27 exceeds the scope of Nesby's own testimony, could be stricken because Saucer's contact

28 information was not disclosed through supplemental disclosures as required by FRCP Rule

1    26(e). Defendants were prevented from investigating and deposing the witness.   Nesby,

2    who claimed not to have his contact information, has now produced a  declaration by the

3    witness that Defendants characterize as a devious attempt to avoid summary judgment. In

4    fact, Saucer's  declaration is cited by Nesby throughout the Opposition at least 39 times

5    and numerous times in support of her response to Defendants' statement of undisputed

6    facts. Where facts were not previously in dispute, Mr. Saucer testifies in his declaration to

7    new contradictory facts.

8          Defendants contend that Nesby's tactics are in clear violation of Rule 26 and that the

9    declaration should be stricken from her opposition to Defendants' motion pursuant to FRCP

10   37. (See Defendants' Objections to Evidence offered in Support of Nesby's Opposition at

11   1:23-3:9.)

12         Further, Nesby relies heavily on unqualified and admittedly mistaken and

13   contradictory expert declarations to create otherwise non-existent factual disputes. (See

14   Defendants' Objections to Plaintiff's Evidence.) Indeed, the experts (particularly Washburn)

15   admitted in their depositions that almost everything in their declarations submitted in

16   support of Nesby's opposition is incorrect or otherwise unreliable. (*Id.*) As such, to the

17   extent that Nesby relies on such evidence to generate issues of fact, it should be

18   disregarded by the Court.

19         Nesby incorrectly contends that Defendants' motion does not challenge Nesby's

20   excessive force claim in any respect. (Oppn. at 10:13-15.) Defendants' motion addresses

21   all of Nesby's constitutional claims generally with respect to her *Monell* claim against the

22   City. While the motion does not seek summary judgment as to Nesby's excessive force

23   claim against Officer Anderson, the Defendants argue that Nesby has not suffered a

24   constitutional injury caused by any policy of the City. (Defendants' MSJ at 12:12-13; 13:5-

25   6.) The city argued that even if a constitutional violation occurred during the course of

26   Nesby's detention and arrest (which would naturally include excessive force), her *Monell*

27   claim against the City still fails. (*Id.* at 13:5-6.) This argument applies to all of Nesby's

28   constitutional claims.

United States District Court
For the Northern District of California

1    The City further contends that Nesby's complaint alleges no basis for recovery under

2    any of the grounds for imposing municipal liability. (*Id.* at 14:3-4.) More specifically, the City

3    argued that "[p]laintiff's reference to the fact that a lawsuit alleging a pattern and practice of

4    constitutional violations was filed against the City (the "Riders" lawsuit) and subsequently

5    settled is certainly not evidence of the existence of a policy or practice of unlawful arrests,

6    racial profiling, or excessive force in that case or this one." (*Id.* at 14:3-7.)

7    **A. Nesby's Detention and Arrest Were Lawful and Nesby's Experts' Opinions**

8    **Do Not Establish any constitutional Violations.**

9    **Officer Anderson's Traffic Stop To Investigate Nesby's Expired Registration**

10   **Tab Was Lawful.**

11   Police officers may make traffic stops whenever there is reasonable suspicion to

12   believe that a traffic violation has occurred. *Whren v. U.S.*, 517 U.S. 806, 810 (1996). The

13   issue here then is whether Officer Anderson had reasonable suspicion to believe that

14   Nesby had expired registration when he pulled her over. It is undisputed that Officer

15   Anderson, while positioned in his police car behind Nesby's vehicle, saw that Nesby had

16   expired registration tabs. (Defendants' Separate Statement of Undisputed Facts ("SSUF")

17   No. 2; Anderson Depo. at 9:11-17.) He knew that the tabs were expired because they were

18   not the right color. (Anderson Depo. at 9:24-25.) Nesby does not dispute these facts.

19   Rather, she cites to her non-responsive deposition testimony that she showed Anderson

20   the temporary registration in her window (see Plaintiff's response to SSUF No. 2), after

21   Anderson had already pulled her over and approached her vehicle. (Nesby Depo at 99:13-

22   23.)

23   The fact that Nesby showed Officer Anderson her temporary registration after the

24   stop had already been made, if true, does not disprove that Anderson had already

25   observed the expired tabs on the rear of her vehicle when he pulled her over. The issue is

26   not whether Nesby's car was actually temporarily registered, but whether Officer Anderson

27   had probable cause to believe that it was not and that a traffic violation had occurred.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1    Hence, Nesby's argument that Officer Anderson did not have reasonable suspicion

2  to stop Nesby because she had a lawful operating permit misses the point. This is not a

3  case involving a traffic stop because someone has temporary tags as in *U.S. v. Wilson*, 205

4  F.3d 720 (4th Cir. 2000) cited by Nesby. (Oppn. at 12, fn. 6.) The temporary identification

5  which was displayed in Nesby's front windshield was not something that Officer Anderson

6  could have seen from behind Nesby's car, or that he could have validated even from in

7  front of her car. Thus, there is no dispute that Officer Anderson did not see evidence of the

8  temporary registration before pulling Nesby over as in the unpublished case of *Imperiale v.*

9  *City of San Diego*, 2005 WL 1463474, 137 Fed.Appx. 13, 14 (9th Cir. 2005) cited by Nesby.

10  (Oppn. at 12, fn. 6.)

11    Defendants contend that Officer Anderson verified that Nesby's license plates were

12  expired before he activated his lights and siren to make the traffic stop, and Nesby has

13  offered no competent evidence to the contrary. (SSUF No. 3, 4; See Defendants'

14  Objections to Evidence.) Nesby has not disputed with competent evidence Officer

15  Anderson's testimony that he saw Nesby's expired registration tabs and confirmed that they

16  were expired before pulling her over as set forth in Fact Nos. 2, 3 and 4.

17    Even if the CLETS inquiry showed that Nesby's registration was current, as she

18  contends and Defendants dispute, even so, the absence of current stickers on her license

19  plate was sufficient to justify a stop, to determine if she had valid temporary registration as

20  required by law. California Vehicle Code section 5202 states that license plates are to be

21  attached for the period of their validity. When a vehicle has no valid plate or plates, as in

22  this instance where the stickers were not current, "Special permits issued in lieu of plates

23  shall be attached and displayed on the vehicle for which issued during the period of their

24  validity." Even if the temporary registration would have been visible if Anderson's police car

25  had approached Nesby's car from the front and then made a U-turn, as she contends, the

26  officer was still entitled to examine the temporary registration to determine if it was valid,

27  and not just a piece of cardboard stuck in the windshield of her car. Even if the facts are as

28  alleged by Nesby, Officer Anderson had reasonable suspicion that Nesby's registration was

1  expired and had probable cause to stop her and determine if she was displaying a

2  temporary tag in compliance with the Vehicle Code.

3  **The Detention Did Not Exceed the Scope of the Traffic Stop.**

4  Nesby contends that her detention exceeded the scope of the traffic stop. This

5  contention, however, is undermined by the undisputed evidence. Detentions which are

6  initially justified as *Terry* investigatory stops, or traffic stops, will not justify seizures which

7  are unreasonable in length or scope in light of their original purpose. *Terry v. Ohio*, 392

8  U.S. 1 (1968).

9  For officers to continue to hold someone, to broaden the scope of the investigation,

10  or to progress to an arrest, they must legally obtain sufficient evidence to justify the greater

11  intrusion on the person's liberty. *Bennett v. City of Eastpointe*, 410 F.3d 810 (6th Cir. 2005).

12  Here, it is undisputed that Officer Anderson pulled Nesby over for having expired

13  registration tabs and that upon contact with Anderson, Nesby immediately began telling him

14  that she had no- bail warrants outstanding in her name. (SSUF No. 9) Although Nesby

15  agrees that this fact is disputed, her contention is contradicted by her own deposition

16  testimony.  Nesby's response to this putative fact is, "Ms. Nesby gave Officer Anderson her

17  license, advised him of the no-bail warrant which bore her name…" (Plaintiff's response to

18  SSUF No. 9.) Indeed, Nesby claims she always tells every officer she comes in contact

19  with before they walk away to run her name. (Plaintiff's response to SSUF No. 10.) At this

20  point, Officer Anderson had sufficient reason to justify prolonging the detention to confirm

21  the existence and status of any warrants in Nesby's name.

22  A reasonable officer conducting a traffic stop confronted with a detainee's admission

23  that she has warrants for her arrest would prolong the investigation to investigate and

24  conduct a warrant check. Indeed, it would be unreasonable for an officer not to do so. The

25  fact that Nesby also told the officer that she had either taken care of the warrants or that

26  she had just been released from jail did not render further investigation unnecessary. As

27  Officer Anderson stated in his declaration and in his deposition, it is not uncommon for a

28  person who has a warrant for his or her arrest to say that the warrant has been cleared up

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   or is really for someone else in order to avoid being arrested. Nesby contends that this is

2   an opinion rather than a fact. (Pltf's response to SSUF No. 36) It is, however, a factual

3   statement based on Officer Anderson's 17 years of experience as a police officer, not

4   merely an opinion. Thus, Fact Number 36 is not disputed.

5        Similarly, assuming that Nesby showed Officer Anderson her temporary registration

6   attached to the right front windshield as she claims, he was justified in investigating her

7   admission that she had two no-bail warrants in her name. Thus, Nesby's argument that the

8   detention should have been aborted immediately after she showed him the temporary

9   operating permit and she told him that she had no-bail warrants for her arrest is wholly

10  without merit. Under normal circumstances, it is true, that an officer who stops a driver to

11  investigate the status of her registration and then finds that she has valid temporary

12  registration, without more, would have no basis to detain her any longer. Those, however,

13  are not the facts in this case. The officer was duty bound to investigate Nesby's admission

14  that she had two no-bail warrants in her name.

15       Nesby's reliance on *U.S. v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994) is

16  misplaced. (Oppn. at 14 8-14.) *McSwain* is distinguishable and inapplicable to the facts of

17  this case. In that case, the court found that the traffic stop was unlawful because the

18  officer's reasonable suspicion regarding McSwain's registration sticker was completely

19  dispelled prior to the time he questioned McSwain. In this case, Nesby began telling Officer

20  Anderson about her felony no-bail warrants when he approached her vehicle and asked for

21  her license and registration. Hence, even if the status of her registration could have been

22  dispelled by the sticker on the windshield on the other side of the car, he was then faced

23  with new information that required further investigation.

24       **Officer Anderson Had Probable Cause to Arrest Nesby Pursuant to a Facially**

25  **Valid No-Bail Warrant.**

26       Nesby argues that Anderson lacked probable cause to arrest her since the warrant

27  was invalid because it did not meet the particularity requirements of the Fourth

28

United States District Court

For the Northern District of California

1   Amendment.  However, the warrant did meet the particularity requirements under both

2   state and federal law, and the cases Nesby cites are inapposite.

3       California Penal Code Section 850 sets out the particularity requirements for

4   electronic arrest warrants. Specifically, Section 850(b) provides that "… an abstract of the

5   warrant as herein referred to shall contain the following information: the warrant number,

6   the charge, the court or agency of issuance, the subject's name, address and description,

7   the bail, the name of the issuing magistrate or authority, and if the offense charged is a

8   misdemeanor whether the warrant has been certified for night service."

9       According to Nesby's own experts, the warrant at issue in this case contained all

10  nine of the elements required by §850. (See Declaration of Pelayo Llamas in Support of

11  Defendants' Reply, Exhibit C at 161:16-165:11; Exhibit D at 144:6-149:12.).

12      In Ex. C, Plaintiff's expert, Valeria Washburn admitted that the license plate for

13  Nesby's car was only queried once, not twice, that it would not necessarily show up on the

14  kind of query that was made and that the descriptors on the warrant of the name, date of

15  birth, race and gender all matched exactly the San Francisco warrant for Ms. Nesby. In Ex.

16  D, Taylor Miller, also an expert for Plaintiff, testified that he didn't know whether or not the

17  warrant on which Nesby was arrested met the factors required by Penal Code section 850.

18  This Court finds that the circumstances in this case are distinguishable from *Rogan v. City*

19  *of Los Angeles*, 668 F.Supp. 1384, 1391 (C.D. Cal. 1987)

20      In *Rogan*, the warrant in question had an alias or *aka* on its face.  Thus it did not

21  contain the subject's correct legal name.  The court noted that an arrest warrant does not

22  meet the Fourth Amendment particularity requirement unless it provides a person's correct

23  legal name. See *Rogan* at 1391. Such a problem does not exist in this case. The warrant in

24  this case did not contain an alias or *aka*. Indeed, the warrant displayed Nesby's correct

25  legal name - - Stancy Nesby - - which Officer Anderson noted was unique. (SSUF No. 20.)

26  The warrant also contained her correct birth date, race and sex – more than required under

27  state and federal particularity requirements. (*Id.*) Nesby argues that this fact is disputed

28  because there is no evidence that the name Stancy Nesby is unique. (Plaintiff's response

1    to SSUF No. 20.) It is a fact, however, that anyone can recognize as true. Even Nesby's

2    own experts acknowledged the uniqueness of her name. (Llamas Decl. at Exhibit C at

3    61:20-62:15; Exhibit D at 129:17-130:1.)  It is by no means a common name, and Nesby

4    has provided no evidence to the contrary.

5         Notwithstanding the uniqueness of Nesby's name, the subject warrant meets the

6    Fourth Amendment's particularity requirements because it does provide Nesby's correct

7    legal name. Generally, the inclusion of the name of the person to be arrested on the arrest

8    warrant constitutes a sufficient description to satisfy the Fourth Amendment requirement

9    that the subject be described with particularity. Fed.R.Crim.Proc. 4(c); 18 U.S.C.A. Const.

10   Amend. 4. Unlike the authorities in *Rogan*, Officer Anderson had no reason to suspect that

11   the name on the warrant was not the real name of the intended arrestee, and no

12   heightened particularity requirements which applied in *Rogan* are applicable to this case.

13        Nesby's argument that the warrant at issue did not state the actual name of the

14   person sought and therefore is invalid is incorrect. At the time of Nesby's arrest, Anderson

15   had no reason to believe that Plaintiff was not the Stancy Nesby named in the warrant.

16   Nesby has cited no legal authority for the proposition that an otherwise facially valid warrant

17   is rendered invalid when a detainee named and described in the warrant claims that he or

18   she is a victim of identity theft or gives some other alibi.[1] Indeed, faced with Nesby's claims

19   that she was not the person listed in the warrant and the consistent description (birth date,

20   race and sex), Anderson believed it was necessary to take her into custody to determine

21   whether it was really her. Only fingerprints could show whether Nesby was the person

22   sought in the warrant.[2]

23        Nesby cites the inapposite case of *Wanger v. Bonner*, 621 F.2d 675, 682-683 (5th

24   Cir. 1980) for the proposition that an arrest warrant with a proper name, but improper

25   address is invalid and thus violates the Fourth Amendment.  *Wanger* is distinguishable

26

27   _____

28        [1] Nesby's expert acknowledged that it is common for people to lie about warrants.
     (Llamas Decl., Exhibit D at 133:12-135:9.)
          [2] Nesby's expert agrees that it was not unreasonable to take Nesby to jail for
     fingerprints. (Llamas Decl., Exhibit C at 161:16-165:11.)

United States District Court

For the Northern District of California

because it involved a misdemeanor search warrant served in the middle of the night at the

home of a person who was able to establish that he was not the person named in the

warrant.  Nesby oversimplifies the holding in *Wanger* out of context. The case at bar does

not involve a warrant with the right name being served at the wrong address. This case is

about an officer with knowledge of a facially valid warrant (under state or federal standards)

with the correct name, birth date, race and sex of Nesby who by her own admission had

outstanding felony no-bail warrants in her name.

The seminal case on this question is *Baker v. McCollan* 443 U.S. 137 (1979). In

*Baker*, a warrant was issued in the name of Linnie McCollan based on the acts of Leonard

McCollan, who was using Linnie's driver's license with a substituted photograph. Linnie was

arrested for running a red light and then held for three days because of the warrant. He was

released after deputies compared his appearance with the photograph of Leonard, which

was associated with the warrant. The Supreme Court held that the arrest and detention did

not constitute a violation of plaintiff's Fourth Amendment rights under 42 U.S.C. § 1983.

> "Whatever claims this situation might give rise to under state tort law, we think it gives rise to no claim under the United States Constitution. Respondent  was indeed deprived of his liberty for a period of days, but it was pursuant to a warrant conforming, for purposes of our decision, to the requirements of the Fourth Amendment."

(*Baker v. Mccollan*, supra 443 U.S. at 144.)                              "[W]e

are quite certain that a detention of three days over a New Year's weekend does not and

could not amount to such a deprivation [of due process]." *Id.* at 145.

In cases that have declined to follow *Baker* the officers knew they were holding an

innocent person, even though they had a facially valid warrant for his arrest, or they

unreasonably relied on the warrant in light of other information they possessed.[3] That is not

---

[3] *See* e.g., *Berg v. County of Allegheny*, 219 F.3d 261, 273 (3d Cir. 2000)(apparently valid warrant does not make officer immune from suit if reliance on it is unreasonable in light of other information the officer possesses); *Kennell v. Gates*, 215 F.3d 825 (8th Cir. 2000)(report, based on fingerprints, over in-house computer message system indicating that wrong sister was in custody was sufficient to allow jury to find that officer had actual knowledge of substantial risk that plaintiff was mistakenly imprisoned); *Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001)(where police arguably had sufficient information to realize they were holding the wrong person, there was close question whether 4th Amendment was violated, but officers entitled to qualified immunity).

the case here. Anderson had nothing more than Nesby's claims of innocence, and he did not disregard those claims. He had Dispatch double check the status of the warrant (SSUF No. 14, 16, 17); he ran her name in his computer a second time and again compared the identifying information (SSUF No. 35); and he followed the arrest wagon to the jail to inform jail staff of what Nesby had told him to ensure that her identity would be confirmed. (SSUF 34.) As stated above and in Defendants' objections to Nesby's evidence, Nesby has offered no evidence to the contrary.

Hence, *Baker* applies, because Officer Anderson had probable cause to arrest Nesby under the facially valid warrant and took reasonable steps to make sure that her claims of innocence were investigated. Her claims were investigated and she was released. Thus, Nesby suffered no constitutional violation, and Defendants are entitled to judgment in their favor as a matter of law.

**Nesby's Mistaken Arrest Was Valid Under the Fourth Amendment.**

Nesby argues that even if the warrant was valid, Officer Anderson still violated her Fourth Amendment rights because he did not have sufficient information that Plaintiff was the person identified as Stancy Nesby. (Oppn. at 16:26-27; 17:14-15.)  Nesby relies on the distinguishable case of *Simons v. Marin County*, 682 F.Supp. 1463 (N.D.Cal.1987), that a higher level of particularity was required for the warrant, including height, weight, social security number, CII number. (Oppn. at 17:7-16.) In *Simons*, however, the court only concluded that more particularity was required when there was an issue as to whether the officer reasonably believed that Nesby was the person sought in the warrant. *Simons* at 1471. In *Simons* the officers served a warrant on a person with the same first and last names as the suspect, but a different middle name. No date of birth, race or sex was on the warrant in *Simons*.

The court in the *Simons* case noted that the arrest of a person other than the actual subject sought is valid under the Fourth Amendment if (1) the police have probable cause to arrest the person and (2) the arresting officers reasonably believe the arrestee to be the person sought. *Id.* at 1471, citing *Hill v. California*, 401 U.S. 797 (1971).

Here, it is undisputed that Nesby had felony no-bail warrants in her name and that she informed the officer of that fact. Thus, there was probable cause to arrest her based on those warrants. Unlike the situation in *Simons*, nothing about the name in the warrant in this case was inconsistent with Nesby's.  Further, in *Simons*, the officers relied on nothing more than "superficial congruence of names" whereas here, Officer Anderson had the correct name as well as other identifying information such as the same birth date, race and gender. In addition, the officers in *Simons* did nothing more than run the name "Fred M. Simons" through the Department of Motor Vehicles computer. And the court noted that "the name is too common and the computer is unable to distinguish by a more accurate name or a birth date." *Id.* at 1472. Whereas here, Officer Anderson ran Nesby's unique name and date of birth through the computer. (SSUF No. 12.)

Nesby contends that more information could have been obtained by Officer Anderson with a reasonable investigation through Dispatch or law enforcement databases accessible to him in his patrol vehicle. But Nesby cites no legal authority that would require such an investigation in the field.  In fact, Officer Anderson did conduct an investigation of the warrant through Dispatch and requested that the information received be confirmed directly with San Francisco. No further investigation by Officer Anderson was required. Officers in the field do not violate the Constitution by relying on process and orders apparently valid on their face (*Whirl v. Kern*, 407 F.2d 781, 790 (5th Cir. 1968) or by relying on information received through "official channels." See *U.S. v. Hensley* , 469 U.S. 221 (1985).

Therefore, Officer Anderson went beyond what was required of him and reasonably believed that Plaintiff was the "Stancy Nesby" sought in the warrant based on the match of Nesby's unique name, her birth date, gender and race and by her admission that she had warrants in her name. At the very least, as Officer Anderson concluded, (SSUF No. 19) the information he had justified taking her to the jail, where her fingerprints could be compared and her identity confirmed.

**United States District Court**
For the Northern District of California

1  **Nesby's Claim That Her Detention Did Not Comport with State Law Fails to**

2  **State a Claim for Relief Under Section 1983.**

3      In order to assert a violation cognizable under section 1983, Nesby must show that

4  Fourth Amendment constitutional standards have been violated. The fact that state law

5  regarding the requirements for arrest may have been violated does not suffice as a basis

6  for a section 1983 action. *Pyles v. Raisor*, 60 F.3d 1211 (6th Cir. 1995). To the extent that

7  Nesby's claims rest on her contention that any aspect of state law was violated (Oppn at

8  13:1-24), Defendants are entitled to summary judgment in their favor accordingly.

9      **Nesby Has Failed to Establish a *Monell* Claim Against the City.**

10      The "policies or customs" of the City upon which Nesby bases her §1983 claims are

11  that the City does not have a policy articulating the particularity requirement for warrants

12  (Oppn. at 7:13-14); Oakland police officers do not receive adequate training about the

13  particularity of description requirements on warrants (Oppn. at 8:10-22)[4]; and the Oakland

14  Police Department has a custom or practice of inaction and indifference in complying with

15  its internal policy requiring that subjects may not be detained for more than four hours

16  pending confirmation of a warrant. (Oppn. at 8:23-25.) None of these assertions are

17  supported by fact or law. Furthermore, Nesby has not offered any evidence that the

18  Oakland Police Department's training and policies fall below standard police practices

19  anywhere in the United States.

20      Nesby's allegations that Defendants violated their own internal policy cannot form

21  the basis of a §1983 claim.  Although inadequacy of training may serve as the basis for

22  municipal liability under certain circumstances, the evidence presented by Nesby does not

23  support such a claim. Nesby has offered no evidence to contradict the undisputed facts

24  demonstrating that Officer Anderson's arrest of Nesby pursuant to the facially valid warrant

25  was reasonable under the Fourth Amendment.  Whatever Anderson's training may have

26  been, Nesby could not have been injured by it one way or the other. Anderson's training

27

28

---

[4] This claim is particularly odd because Nesby's own expert witness testifies that he received his only training on warrants from OPD. (Llamas Decl., Exhibit D at 127:24-128:7.)

1   would only be relevant if Nesby had demonstrated that her constitutional rights were

2   violated as a result of Anderson's lack of understanding of the Automated Warrant System,

3   the NCIC system or Penal Code Section 850(b).

4          Nesby has failed to show a constitutional injury at all, let alone one that was the

5   result of Anderson's lack of training. In fact, Nesby offers absolutely no evidence of

6   Anderson's training. Her general evidence of current training practices is vague as to time,

7   irrelevant and lacking in foundation as to what knowledge Anderson obtained regarding

8   AWS, NCIC and Penal Code section 850 over his 17 years of service as a police officer. In

9   fact, Nesby has offered no evidence regarding Anderson's knowledge of electronic warrant

10  systems nor how any deficiencies in his knowledge caused her alleged constitutional

11  violation. Without more, Nesby's argument that had the police department properly trained

12  its employees in the enforcement of warrants, she would not have been arrested is wholly

13  without merit and cannot form the basis of a *Monell* claim against the City in this case.

14         Nesby has failed to establish a nexus between the alleged lack of training of officers

15  in general and Anderson's reliance on the communication from Dispatch which confirmed

16  the active status of Nesby's warrant with the issuing county.  Anderson was entitled to rely

17  on that information regardless of his training or lack thereof. An officer may arrest someone

18  solely or partly based on information received from official police communications, such as

19  information from Dispatch. See *U.S. v. Hensley*, 469 U.S. 221, 232 (1985); see also *U.S. v.*

20  *Bernard*, 623 F.2d 551, 560-61 (9th Cir. 1979) (probable cause for arrest can be based on

21  "collective knowledge" of law enforcement officers).

22         Moreover, the requisite policy, custom or usage may not be proved through a single

23  unconstitutional incident unless "proof of the incident includes proof that it was caused by

24  an existing unconstitutional policy." *Rogan v. City of Los Angeles*, 668 F.Supp. 1384, 1395

25  quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985). In contrast, it is sufficient to

26  show a pattern of similar incidents in which citizens were injured or endangered by

27  intentional or negligent police misconduct or that serious incompetence or misbehavior was

28  general or widespread throughout the police force. *Id.*

**United States District Court**
For the Northern District of California

Nesby has made no showing of custom or usage in this case.  She references this single incident and offers no proof that the alleged constitutional violation occurred as a result of inadequate training of officers in general. Therefore, Nesby has failed to show a material issue of fact in dispute relative to her *Monell* claim against the city.

### Anderson is Entitled to Qualified Immunity.

Nesby relies on *Simons*, fully distinguished above, for her contention that Anderson is not entitled to qualified immunity. Although Nesby is correct that in *Simons*, the court found that the law was clearly established that an officer must have reasonable probability to believe that the person served is the person named in the warrant in order for the arrest to pass Fourth Amendment muster, unlike the plaintiff in *Simons*, Nesby fails to raise triable issues as to whether Anderson reasonably believed that Nesby was the person named in the warrant.

In *Simons*, the court noted that there were triable issues because none of the officers checked for any information about the man they were serving, and they looked only for information about the suspect named in the warrant.  After they obtained some information which tended to rebut their assumption that plaintiff was the suspect, they did nothing further, even though other investigation was possible. *Simons* at 1475.

Here, Officer Anderson obtained Nesby's license and ran a warrant check based on her name and date of birth. He then determined that other identifying information in the warrant such as birth date, race and gender matched Nesby's description. He had Dispatch run a warrant check and then had them confirm the warrant with the issuing county. He then went to the jail after she was arrested and informed the jail staff about Nesby's claims of identity theft. Jail staff followed up on her claim of innocence and confirmed that she indeed was not the person sought in the warrant and released her. These are facts that Nesby has failed to dispute. As such, the reasoning in *Simons* is unavailing to Nesby here.

In determining whether Officer Anderson is entitled to qualified immunity we must answer two questions: (1) was the law governing the officer's conduct clearly established?

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

(2) under that law, could a reasonable officer believe that his conduct was lawful? *Case v. Kitsap County Sheriff's Dept.*, 249 F.3d 921, 926 (9th Cir. 2001) (citations omitted).

With respect to the arrest and detention, Nesby had no clearly established right to be free from detention pursuant to a facially valid warrant. As stated above, the warrant in this case contained everything required in Penal Code Section 850 and more than is required under the Fourth Amendment particularity requirement.  Even conceding that Nesby's constitutional rights under the Fourth Amendment are clearly established, under the second prong of the analysis, Officer Anderson is entitled to qualified immunity because a reasonable officer could believe that his conduct did not violate Nesby's constitutional rights.

In *Case v Kitsap*, the court addressed the question whether a reasonable officer could believe that Case's arrest on an Oregon warrant was lawful. 249 F.3d at 926. The court noted that "it is well established that, in an action for unlawful arrest pursuant to a facially valid warrant, a police officer is entitle to qualified immunity unless "no officer of reasonable competence would have requested the warrant." *Id.*, citing *Malley v. Briggs*, 475 U.S. 335, 345-46 & n. 9 (1986); accord *Barlow v. Ground*, 943 F.2d 1132, 1139 (9th Cir. 1991) ("A police officer generally has qualified immunity for conducting an unconstitutional search if he is acting on the basis of a facially valid warrant."); *Mills v. Graves*, 930 F.2d 729, 731 (9th Cir. 1991) (noting that "immunity will be lost only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable").

Here, it is undisputed that the warrant was facially valid. Nesby's arguments to the contrary are unavailing. To the extent Nesby argues that Officer Anderson or other city staff violated state law or an internal departmental policy, that is not the proper focus for a qualified immunity analysis. Indeed, violation of a police departmental regulation is insufficient for liability under section 1983.  *Kitsap* at 928 (citations omitted). Any state

United States District Court

For the Northern District of California

1  violation of its own policy is irrelevant to the question of whether state officials are entitled

2  to qualified immunity. *Id.* citing *Backlund v. Barnhart*, 778 F.2d 1386 (9th Cir. 1985).[5]

3       Thus, the issue is whether a reasonable officer would have known that his conduct

4  violated Nesby's federal statutory or constitutional rights rather than merely a state law or

5  policy provision. *Id.* citing *Davis v. Scherer*, 468 U.S. 183, 194 & n. 12 (1984). Here, a

6  reasonable officer with a facially valid warrant, the detainee's admission that there are

7  felony no-bail warrants in her name, matching descriptions between the warrant and the

8  detainee including a full unique name, date of birth, race, and sex, would reasonably

9  believe that taking her to jail pursuant to the warrant did not violate her constitutional rights.

10 With respect to her protests of innocence and identity theft, a reasonable officer could have

11 believed it did not violate Nesby's constitutional rights to do what Officer Anderson did –

12 take her to jail where her fingerprints could be compared with to those on file in San

13 Francisco for the person being sought in the warrant and make sure that jail staff was made

14 aware of her claims of innocence.

15      A reasonable officer under the same circumstances could have believed that nothing

16 more was required of him under the law. Therefore, Officer Anderson is entitled to qualified

17 immunity.

18

19               **Nesby's Detention Was Not Unduly Prolonged.**

20      Citing *Florida v. Royer*, 460 U.S. 491, 560 (1983), Nesby asserts that a detention

21 may continue only for so long as necessary and must be conducted in the least intrusive

22 manner. The entire basis for her assertion that her detention was unduly prolonged is that

23 Officer Anderson failed to follow through on an alleged promise to have her fingerprints

24 compared with those maintained by San Francisco, so that she could be cleared and

25 released. It is not clear how, even if true, such a vague allegation would rise to the level of

26

27

28  _____

   [5] In *Backlund* at 1390, the court dismissed plaintiffs' §1983 claim because they "failed
   to show a violation of any constitutional right," despite violation of internal policy). Thus, to the
   extent that any of plaintiff's §1983 claims are based on Defendants' violation of their own
   internal policies, Defendants argue they should be similarly dismissed.

United States District Court

For the Northern District of California

1    a constitutional violation.  It is undisputed that after Nesby was taken to jail, her fingerprints

2    were compared with those maintained by San Francisco and that she was released after it

3    was determined that her fingerprints and photo did not match those of the person wanted in

4    the warrant (who had stolen Nesby's identity). (SSUF No. 38, 39.) Whether or not Anderson

5    was responsible for having the confirmation done or not is irrelevant. The issue is whether

6    the length of Nesby's detention under the circumstances amounts to a constitutional

7    violation.  It does not.

8        It is undisputed that Officer Anderson released Nesby to the custody of the arrest

9    wagon (SSUF No. 33) and followed her to jail.  He related to the intake officer what Nesby

10   had told him. (SSUF No. 34.) Nesby's allegation that Anderson told her that he would

11   ensure that her fingerprints were compared and failed to do so does not contradict this fact.

12   Nor does her allegation (based on double hearsay) that Officer Anderson did not know

13   what happened to her after she was transported to jail. (Plaintiff's response to SSUF No.

14   34.) Thus, Fact Numbers 33 and 34 remain undisputed.

15       Nesby's argument that jail staff failed to comply with the city's policy that a subject

16   not be detained for more than four hours pending confirmation of a warrant is equally

17   unavailing. The internal standards set by the police department do not confer federal

18   constitutional rights on detainees. Only the Federal Constitution or laws can be the

19   underlying basis for a section 1983 claim. See *Maine v. Thiboutot*, 448 U.S. 1 (1980).

20       Even if the violation of an internal policy could create a constitutional violation,

21   Nesby has presented no evidence of a practice of deliberate indifference to the

22   constitutional rights of those being detained while warrants are being confirmed. The city's

23   internal policy clearly sets a higher standard than is required under the Constitution.

24   Therefore, Nesby cannot establish liability against the city under a prolonged detention

25   theory.

26                   **Defendants' Objections to Nesby's Evidence**

27       Defendants ask the Court to strike the Declaration in Support of Plaintiff's Opposition

28   to Defendants' Motion for Summary Judgment and all evidence offered by John "Toby"

United States District Court

For the Northern District of California

1   Saucer and preclude Nesby from using it at trial, on the basis that Rule 26, Federal Rules

2   of Civil Procedure, mandates that this evidence be stricken due to Nesby's procedural

3   violations. Her counsel timely disclosed this witness but gave defense counsel no address

4   (Nesby claims she gave the location at 41st and Market, including that it was "across the

5   street from California Linens", and a telephone number for Mr. Saucer which proved to be

6   incorrect).

7        On November 15, more than three months after the close of discovery on July 28,

8   Ms. Nesby went to Saucer's home and left him a message, He contacted her counsel and

9   agreed to be interviewed November 28 2006.  Consequently, although Nesby used

10   Saucer's testimony extensively in her opposition to Defendants' summary judgment motion,

11   Defendants never had an opportunity to depose him.

12        Saucer is the Plaintiff's most significant witness in this case, next to Nesby herself,

13   since he was in the car with her when she was arrested. Defendants object that his

14   testimony "miraculously" corroborates Nesby's, in places where there was formerly no other

15   corroboration.  As a result his testimony is extremely prejudicial to Defendants.  Nesby cites

16   him 26 times in Plaintiff's Response to Defendants' Statement of Material Facts and 42

17   times in her Opposition Memorandum.

18        Nesby's counsel contends that he did the best he could to inform him of Saucer's

19   whereabouts and that defense counsel did not follow up and remind him to obtain more

20   accurate contact information for Saucer. There is really no excuse, and it is tempting to

21   speculate that this witness was kept under wraps because he may not withstand close

22   scrutiny and Nesby really needs him to corroborate her claim for excessive force against

23   Anderson, which will be the only issue at trial. Nesby must show substantial justification or

24   lack of prejudice in order to oppose the motion to exclude this evidence. *NutraSweet Co. v.*

25   *X-L Engineering, Co.*, 227 F.3d 776, 785-786 (7th Cir. 2000); *Saudi v. Valmet-Appleton,*

26   *Inc.*, 219 F.R.D. 128, 132 (E.D. Wis. 2003).

27

28

**Nesby's Objections to Defendants' Evidence**

Nesby objects to such words as "verification" as vague and ambiguous with reference to the warrant, to "active" with reference to the warrant, and to "effectively closed down" as referring to the jail during a change of shift. The Court finds that these words and phrases may be interpreted according to their plain dictionary meaning and are not vague and ambiguous.

Nesby also objects on the basis of lack of personal knowledge by Anthony Wynne to whether "City Jail staff worked with the Alameda County Sheriff's Office" to determine whether Nesby was the proper subject of the warrant. She objects as well to whether Anderson had personal knowledge that Stancy Nesby "is a pretty unique name." She also objects that this is improper opinion testimony. Both declarants are qualified to testify to matters within their personal experience without being qualified as experts.

Nesby objects to Defendants' Request for Judicial Notice of Court Documents on relevance grounds and as a discovery violation, since some of the documents were not disclosed to Nesby as required by FRCP Rule 26, specifically Exhibits B, C, D and E (respectively, the bench warrant #576880, 579116, the minutes of a San Francisco Superior Court proceeding, printed on April 30, 2002, describing Stancy Nesby as a fugitive, and a second set of minutes, with a different MC#, both showing that fingerprints were taken of the person in court.

Nesby objects that Defendants did not disclose that they were going to rely on these documents. It is not credible that Nesby could be ambushed by Defendants' reliance on the court documents that led directly to her arrest, or contend that she has been ambushed or in any way prejudiced by Defendants' using these documents.

**Conclusion re Evidence**

Defendants ask the Court to exclude the evidence contained in the declarations of John "Toby" Saucer, who was in the car with Nesby at the time of her arrest and is the only corroboration for many of her allegations. The Court at this time need not rule on

1    Defendants' motion, because Saucer's evidence is relevant for the most part only to

2    Nesby's claim of excessive force against Anderson, which is not before the Court at this

3    time. The Court may either exclude this evidence at trial.  In the meantime discovery is

4    reopened for the limited purpose of allowing Defendants to take Saucer's deposition.

5         Nesby asks the Court to exclude evidence from several declarations on grounds of

6    hearsay and vagueness. The Court finds that the terms to which Nesby objects, for

7    example "verification" as applied to the warrant, can be construed using their dictionary

8    definitions and that the declarants testified according to personal knowledge of procedures.

9    Therefore their declarations are neither hearsay nor impermissible opinions. The Court also

10   declines to exclude documents in Defendants' Request for Judicial Notice, since Nesby

11   cannot claim surprise or prejudice from Defendants' reliance on the warrants which are

12   central to this case.

### Conclusion re Defendant's Motion for Summary Judgment

14        For the reasons stated above, Defendant's Motion for Summary Judgment is

15   granted in its entirety.  While the circumstance underlying this case were indeed

16   unfortunate, Plaintiff fails to establish a genuine issue of material fact in dispute sufficient to

17   take these Defendants to trial on these claims.

18        IT IS SO ORDERED.

19        DATED: March 19,  2007

22   _____
     James Larson
23   Chief Magistrate Judge

24   G:\JLALL\CHAMBERS\CASES\CIVIL\05-3555\ord-54.wpd

**United States District Court**
For the Northern District of California